# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 16, 2012

No. 10-41332

Lyle W. Cayce
Clerk

AJAY GAALLA, M.D., HARISH CHANDNA, M.D., and DAKSHESH
"KUMAR" PARIKH, M.D.,

Plaintiffs-Appellees

v.

DAVID P. BROWN, DONALD DAY, JOE BLAND, ANDREW CLEMMONS,
M.D., JENNIFER HARTMAN, LUIS GUERRA, and WILLIAM TODD
CAMPBELL, M.D.,

Defendants-Appellants

Appeal from the United States District Court for the
Southern District of Texas
USDC No. 6:10-cv-14

ON PETITION FOR REHEARING

Before BENAVIDES, PRADO and GRAVES, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

IT IS ORDERED that the petition for rehearing is granted in part and
denied in part. We WITHDRAW our earlier opinion, *Gaalla v. Brown*, 2012 WL
105028 (5th Cir. Jan. 13, 2012), in its entirety, and substitute the following:

---

[*] Pursuant to FIFTH CIRCUIT RULE 47.5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances set forth
in FIFTH CIRCUIT RULE 47.5.4.

No. 10-41332

In this case, Defendants-Appellants David P. Brown, Donald Day, Joe Bland, Andrew Clemmons, M.D., Jennifer Hartman, Luis Guerra, and William Todd Campbell, M.D. appeal the district court's denial of summary judgment against Plaintiffs-Appellees Ajay Gaalla, M.D., Harish Chandna, M.D., and Dakshesh Parikh, M.D. For the following reasons, we AFFIRM in part REVERSE in part, and REMAND with instructions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendants Day, Bland, Clemmons, M.D., Hartman and Guerra are all members of the Board of Directors (collectively, "the Board") of Citizens Medical Center ("CMC"), a county-owned, non-profit hospital located in Victoria, Texas. Defendant David Brown ("Brown") is the administrator or chief executive officer of CMC, and he reports to the Board. Dr. Campbell is a cardiologist under contract with CMC. The defendants were sued by three interventional cardiologists of Indian origin, Plaintiffs-Appellees Ajay Gaalla, M.D., Harish Chandna, M.D., and Daksheesh Parikh, M.D. (collectively, "the Cardiologists"). The Cardiologists allege that Brown and the Board violated their due process and equal protection rights, in part by passing a resolution ("Resolution") that stated that the hospital would only allow cardiologists with contracts with CMC to exercise clinical privileges in the cardiology department or as part of CMC's heart program. The Cardiologists charge Dr. Campbell with state-law claims of tortious interference with existing and prospective relations and defamation.

Before 2007, the Cardiologists regularly admitted their patients at CMC and practiced at the hospital without a problem. However, they claim that misconduct by CMC and its agents against them began to occur in 2007. The Cardiologists say that Brown discriminated against them by denying them

2

No. 10-41332

privileges for implantable cardioverter defribillators ("ICD") in May 2007, while granting those privileges to less qualified, non-Indian physicians. They also allege that Brown removed Dr. Chandna from the peer review committee, allegedly for missing too many meetings, though Dr. Chandna claims to have attended more meetings than anyone besides the chairman of the committee. The Cardiologists further state that, in 2009, Brown removed them from the Chest Pain Center Committee for being disruptive, while other disruptive doctors were allowed to remain on the committee. According to the Cardiologists, Brown amended the Chest Pain Center protocols to exclude them by instructing staff to notify only the cardiologist "on call" when a patient presented, even if that patient already had a pre-established relationship with one of the Cardiologists. They also claim that in at least two instances Brown initiated peer review proceedings against them when they voiced patient care concerns regarding Dr. Yusuke Yahagi, the only cardiac surgeon at CMC, rather than investigating their concerns, and that "this type of reverse-investigation was never undertaken when other physicians lodged patient care concerns." In addition, the Cardiologists allege that Dr. Yahagi refused to provide surgical standby for their patients, and that Brown enabled Dr. Yahagi to do this for nearly a month rather than enforcing the bylaws, which require that Dr. Yahagi provide standby for any cardiologist practicing at the hospital.

The Cardiologists also describe other instances of discrimination they allegedly suffered. They say that CMC offered contracts to a group of non-Indian cardiologists ("contract cardiology group"), but never legitimately offered those contracts to the Cardiologists. They call CMC and Brown's offers of contracts to them "a farce," and "a mere afterthought by CMC in a veiled attempt to convey

3

No. 10-41332

an appearance of fairness." The Cardiologists say that since 2007, various people at CMC, including Brown, have referred to them as "the Indians," while the members of the contract cardiology group have been called "the Cowboys."[2] The most obvious instance of a discriminatory attitude displayed by Brown is an internal memo he wrote in March 2007:

> I feel a sense of disgust but am more concerned with what this means to the future of the hospital as more of our middle Eastern born physicians[3] demand leadership roles and demand influence over situations that are hospital issues. . . . If, however, I am forced to acquiesce to their demands at a personal level, it will change the entire complexion of the hospital and create a level of fear among our employees.

The Cardiologists also cite a comment by CMC's operating chief about a plan to "work on getting the Indians off the reservation." They claim that the Board member defendants and Brown never disciplined CMC employees for derogatorily referring to the Cardiologists as "the Indians." Another physician of Indian descent at CMC testified that "[i]t was well known . . . that David Brown did not want physicians of Indian origin in leadership roles at CMC," and a former E.R. doctor at the hospital testified to racial tensions between the Cardiologists and the hospital.

The Defendants-Appellants respond that CMC entered into contracts with

---

[2] There is evidence that the Cardiologists initially jokingly referred to themselves as "the Indians," and the cardiologists under contract as "the Cowboys." However, the Cardiologists came to feel that CMC staff and administrators were calling them "the Indians" in a derogatory manner.

[3] Brown has confirmed that, despite the fact that the Cardiologists are of Indian origin, he was referring to them when he used the phrase "middle Eastern born physicians."

No. 10-41332

the contract cardiology group to ensure that those doctors' services remained available, because they were being recruited by other health organizations. They also say that their offer of the same contracts to the Cardiologists was genuine. According to the Defendants-Appellants, CMC continued to "experienc[e] significant operational difficulties in its cardiac care program" even after signing employment contracts with the contract cardiology group, and that "Plaintiffs were a large part of the problem." Specifically, the Cardiologists did not have a good relationship with Dr. Yahagi, the cardiovascular surgeon. The Defendants-Appellants also cite to admissions by the Cardiologists that they had "friction with doctors and staff at CMC," especially Dr. Yahagi. CMC feared that if the Cardiologists and Dr. Yahagi continued to experience difficulties working together, Dr. Yahagi would leave Victoria and the hospital would no longer have a cardiovascular surgeon.

According to the Cardiologists, the misconduct and discrimination against them culminated in a Resolution passed by the Board on February 17, 2010. The Resolution stated that "the Hospital heart program is now experiencing operational problems and difficulties," and that CMC "received an opinion from a qualified and independent consultant that a reasonable solution to correct the operational problems set forth . . . is to close and limit the Hospital's cardiology department exclusively to one group of cardiologists." Therefore, "[o]nly those physicians who are contractually committed to the Hospital to participate in the Hospital's on-call emergency room coverage program shall be permitted to exercise clinical privileges in the cardiology department or as part of the Hospital's heart program." The Resolution also closed the cardiovascular surgery staff "such that Dr. Yusuke Yahagi is the only member of the medical

5

No. 10-41332

staff with cardiovascular surgical privileges." Because the Cardiologists are not under contract with CMC, the Resolution prevented them from exercising their privileges and treating patients at CMC.

The Cardiologists filed suit on February 24, 2010, the day the Resolution was to take effect. They also sought a temporary restraining order ("TRO") and preliminary and permanent injunctions. The district court granted the TRO, expressly predicating the grant on the Cardiologists' substantive due process claim, as their equal protection claim was not added until their second amended complaint was filed on August 6, 2010. On March 12, 2010, the district court issued a preliminary injunction. Defendants appealed, and on January 6, 2011, this Court reversed the district court's order.

In the interim, the district court issued an order on December 22, 2010, granting in part and denying in part the various motions for summary judgment filed by the Defendants. The court found that the Cardiologists did not have a liberty interest in practicing in Victoria that was violated by the Resolution, or by any other actions perpetrated by the Defendants. However, the district court held that the Cardiologists had a property interest in their privileges at CMC, including an interest in receiving phone calls or referrals when their patients presented at the hospital, and that the Resolution terminated those privileges without providing due process. The court further found that "[t]here is a genuine dispute as to whether racial animus was the motivating factor behind the conduct at issue here," and cited the parties' conflicting evidence as to the reasons for the actions taken against the Cardiologists. Because the district court held that the Plaintiffs had "provided sufficient facts to make out a violation of their due process and equal protection rights," and that those rights

No. 10-41332

were clearly established, it denied the Defendants qualified immunity on those claims.[4]

The district court also denied official immunity to Dr. Campbell for the state-law claims against him. The court found that Dr. Campbell had not proved that he acted in good faith at all times. Therefore, because he had failed to meet his burden to establish official immunity under Texas law, Dr. Campbell's motion for summary judgment was denied.

## II. STANDARD OF REVIEW

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a state actor claims qualified immunity, a court must make two separate inquiries: "(1) whether the defendant's conduct violated a constitutional right, and (2) whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (citing *Pearson,* 555 U.S. at 232). Judges may decide the order in which they address the two prongs of the qualified immunity test "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

A denial of a motion for summary judgment based on qualified immunity, unlike a denial of summary judgment on other grounds, is immediately appealable. *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc).

---

[4] The district court granted qualified immunity to board member Paul Holmes, because he had abstained from voting on the Resolution, and thus was not personally involved in its passage.

No. 10-41332

However, "[f]or purposes of [an] interlocutory appeal, we are obliged to take, as given, the facts the district court assumed, and our inquiry is limited to the narrow question of whether those facts are sufficient to state a claim under clearly established law." *Coleman v. Hous. Ind. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997); *see also Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003) ("The district court's determination that fact issues are genuine is not appealable. However, his determination that those fact issues are material, that is, that resolution of them might affect the outcome of the case under governing law, is appealable . . . ."). "Therefore, [in an interlocutory appeal asserting qualified immunity,] we do not apply the standard of Rule 56[,] but instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney*, 367 F.3d at 348. This Court "'can review the *materiality* of any factual disputes, but not their *genuineness.*'" *Id.* at 347 (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)). However, in reviewing the district court's legal conclusions, i.e., the materiality of the facts, "our review is of course *de novo.*" *Id.* at 349.

Our review of the district court's subject matter jurisdiction over the state-law claims against Dr. Campbell is plenary. *Griffin v. Lee*, 621 F.3d 380, 384 (5th Cir. 2010) (per curiam).

### III. ANALYSIS

### A. Due Process Claims

The Cardiologists' due process claims relate only to passage of the Resolution. Unfortunately, in ruling on the Defendants' motion for summary judgment in relation to those claims, the district court did not have the benefit

No. 10-41332

of our previous ruling reversing the grant of a preliminary injunction. In that decision, we determined that "the Resolution is a 'legislative act' because it excludes any cardiologist seeking to practice at CMC without a contract with the hospital." Citing *Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1078 (5th Cir. 1989), we applied rational-basis scrutiny to determine whether the Resolution violated the Cardiologists' substantive due process rights. We found that "[p]reventing Yahagi from leaving CMC was a conceivable rational basis for closing the cardiology department," and "[t]he record provides ample evidence supporting CMC's claim that Yahagi's departure was a reasonably conceivable possibility." Therefore, because the Resolution had a conceivable rational basis, we held that "the Cardiologists' substantive due process claim did not have a substantial likelihood of success, and the district court's grant of the preliminary injunction was an abuse of discretion."

The Defendants-Appellants now argue that our previous ruling is the law of the case. We have held that a decision on interlocutory appeal of the grant of a preliminary injunction constitutes law of the case as to legal determinations. *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 3 F.3d 877, 881 (5th Cir. 1993). Such an appeal of a preliminary injunction usually will not establish law of the case as to factual determinations, however. *Id.* This is because "the lesser standard of review applied during an appeal of a preliminary injunction necessarily means that the factual issues differ from those on direct appeal." *Id.* Decisions in other circuits mirror our holding that conclusions of law made by a court of appeals regarding a preliminary injunction become the law of the case, and binding on that court in further proceedings. *See, e.g.*, *ACLU v. Mukasey*, 534 F.3d 181, 189-90 (3d Cir. 2008) (stating that "those conclusions [that did not

No. 10-41332

depend on the factual record] remain binding on us now"); *Naser Jewelers, Inc. v. City of Concord, N.H.*, 538 F.3d 17, 21 (1st Cir. 2008) ("The precedent established by the prior panel is not clearly erroneous; it is the law of this case and the law of this circuit."); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) ("Any of our conclusions [at the preliminary injunction phase] on pure issues of law, however, are binding."); *see also* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.5 (2002) ("A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.").

Based on the foregoing precedent, our previous determinations–that the Resolution was a legislative act, that rational-basis scrutiny applies, and that the Defendants-Appellants had a rational basis for passing the Resolution such that it did not violate the Cardiologists' substantive due process rights–are all legal findings that are now binding law of the case. The record on appeal contains no new facts that substantially change these legal conclusions, nor has new precedent made our previous decision contrary to the law. *See Royal Ins.*, 3 F.3d at 880 ("Under this doctrine, we will follow a prior decision of this court without reexamination in a subsequent appeal unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work manifest injustice." (internal quotation marks and citation omitted)). Therefore, the Cardiologists' claim that the Resolution violated their substantive due process rights must fail.

No. 10-41332

The district court's grant of a preliminary injunction was based only on the Cardiologists' substantive due process claim, such that this Court's decision concerning the previous interlocutory appeal concerned only that claim, as well. However, a finding that the Resolution is a legislative act also forecloses the Cardiologists' procedural due process claim. *See Martin v. Mem'l Hosp. at Gulfport*, 130 F.3d 1143, 1149 (5th Cir. 1997) ("Generally applicable legislative and quasi-legislative decisions, wherein the competency or integrity of the individual appellants is not in question, are not subject to procedural due process constraints, even though they result in a deprivation of a recognized liberty interest. ")*; Jackson Ct. Condos.*, 874 F.2d at 1074 (stating that "it is well established law that once an action is characterized as legislative, procedural due process requirements do not apply" to the deprivation of a claimed property interest).    Thus, the Cardiologists' claim that the Resolution violated their procedural due process rights must fail.    This is so regardless of whether the Cardiologists claim a property or liberty interest in their privileges.[5]

"Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009). The Defendants-Appellants did not violate the Cardiologists' due process rights by passing the Resolution. Therefore, they are due to receive qualified immunity from suit on this claim. *See Terry v. Hubert*,

---

[5] The district court rejected the Cardiologists' claim to a liberty interest in their privileges, but found that they had a valid property interest. The Cardiologists here argue that the district court was correct as to its ruling that they have a property interest, but erred in finding that there is no associated liberty interest. Since the Board's action in passing the Resolution is not subject to procedural due process constraints, both arguments fail.

609 F.3d 757, 762 (5th Cir. 2010) ("The Warden is entitled to qualified immunity because he did not violate Terry's right of access to the courts.").

## B. Equal Protection Claims

The Cardiologists allege that the Resolution violated their equal protection rights under the Fourteenth Amendment. They also claim that a series of other actions by Brown infringed on those rights. We will address these claims in turn.

### 1. The Resolution

According to the Cardiologists, the Resolution violated their equal protection rights because it was motivated by racial animus. The Defendants-Appellants, however, claim that the Cardiologists' disruptive behavior and issues with Dr. Yahagi led to passage of the Resolution. The district court held that "[t]here is a serious factual dispute as to the motivation behind nearly every action taken against Plaintiffs at CMC, up to and including the Board Resolution," and thus denied summary judgment.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "Laws that explicitly distinguish between individuals on racial grounds fall within the core" of the Equal Protection Clause's prohibition, *Shaw v. Reno*, 509 U.S. 630, 642 (1993), and are subject to strict scrutiny, *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999). The same principles apply to legislation that is facially neutral but the product of a racially discriminatory purpose, *id.*, or that, on its face, is "unexplainable on grounds other than race," *Shaw*, 509 U.S. at 644 (quoting *Arlington Hts. v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)). Similarly, statutes that

No. 10-41332

"impinge on personal rights protected by the Constitution" are subject to strict scrutiny. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). It is not enough for a law to have only discriminatory effects; it must also be animated by a discriminatory intent. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 243 (1976) (inquiring into the motives underlying a legislative decision where there were "disproportionate racial consequences"); *Arlington Hts.*, 429 U.S. at 264-65 (stating that *Washington v. Davis* "made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact," and "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Hunter v. Underwood*, 471 U.S. 222,  227 (1985) (applying the test from *Arlington Heights*, and holding that "a neutral state law that produces disproportionate effects along racial lines" was unconstitutional where there was also strong evidence that it was motivated by racial animus); *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) ("The Supreme Court has instructed us time and again, however, that disparate impact alone cannot suffice to state an Equal Protection violation . . . . Thus, a party who wishes to make out an Equal Protection claim must prove the existence of purposeful discrimination motivating the state action which caused the complained-of injury." (internal quotation marks and citations omitted)).

Here, the Cardiologists argue that the district court's finding that the passage of the Resolution was motivated by racial animus must not be disturbed, because that is a factual finding. As stated earlier, "we are obliged to take, as given, the facts the district court assumed, and our inquiry is limited to the narrow question of whether those facts are sufficient to state a claim under

13

clearly established law." *Coleman*, 113 F.3d at 534. As the standard above indicates, the district court's finding that the Resolution was motivated by a discriminatory purpose dictates that we subject the Resolution to strict scrutiny. The Board members therefore must show that the Resolution is "narrowly tailored to further a compelling governmental interest." *Shaw*, 509 U.S. at 643. This they have failed to do. They state that "[i]n adopting the Resolution, the Board of Directors considered the ongoing operational problems in CMC's cardiac care program that were being caused by the disruptive behavior of" the Cardiologists, and they "also considered the value of having an exclusive arrangement with a smaller number of cardiologists." We find neither of these reasons compelling enough to justify a discriminatory legislative act. Thus, the Resolution does not survive strict scrutiny.[6]

Because the Resolution does not withstand strict scrutiny, the Cardiologists have adequately made out an equal protection claim. Furthermore, it is without question clearly established that the Cardiologists have a right to be free from racial discrimination. *See, e.g.*, *Piatt v. City of Austin*, 378 F. App'x 466, 469 (5th Cir. 2010) (per curiam) ("[G]enerally, where

---

[6] At oral argument, counsel for the Board members argued that because the Cardiologists were offered the same contracts that were offered to and accepted by the contract cardiology group, the EP claim against the Board could not survive. Indeed, there is summary judgment evidence that the Cardiologists were offered the same contracts that were offered to the contract cardiology group. However, the summary judgment evidence also indicates that the contracts were never formally offered to the Cardiologists, and that such informal offers were made three years before the Resolution at issue was passed. Because of the district court's factual determination that racial animus motivated the passage of the Resolution, we need not opine on the effects of the alleged contract offers on the Cardiologists' claims. Moreover, if there was a refusal of the contracts, this may have a bearing on the damages, if any, available to the Cardiologists in the event that they prevail on their equal protection claim.

No. 10-41332

the evidence is sufficient to support a claim of intentional gender or race discrimination, any immunity defense will be foreclosed."); *Jackson v. Hous. Indep. Sch. Dist.*, 1999 WL 511478, at *7 (5th Cir. 1999) (per curiam) (stating that "Jackson has a clearly established right to be free from racial discrimination in employment"). Therefore, the Board members are not entitled to qualified immunity, and the district court properly denied them summary judgment on this claim.

## 2.  Brown's Actions

The Cardiologists also claim that other actions perpetrated by Brown violated their equal protection rights.  Those other acts are:

1. In May 2007, CMC and Brown denied privileges, including ICD privileges, to Plaintiffs and gave them to other non-Indian physicians;

2. The Plaintiffs' ability to receive calls when a patient presented was restricted;

3. Brown entered into contracts with the other, non-Indian cardiology group;

4. Brown kicked the Cardiologists off of the Chest Pain Center Committee, while other cardiologists were permitted to remain;

5. Brown amended the protocols for the Chest Pain Center to exclude the Cardiologists;

6. Brown initiated reverse investigations of the Cardiologists when they lodged patient-care concerns;

7. Dr. Chandna was removed from the peer review committee;

15

No. 10-41332

8.    Brown allowed Yahagi to refuse to provide the
Cardiologists with surgical standby for a month.

The district court found that the "Plaintiffs rely upon direct evidence of discrimination [in asserting their equal protection claims], and therefore do not employ the *McDonnell Douglas* burden shifting test." (Referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The district court agreed with the Cardiologists that the evidence of discrimination described above–Brown's memo, and reference to his "Indian troubles"–constituted direct evidence of discrimination. The district court therefore found that the Cardiologists had made out a prima facie case of discrimination by presenting evidence suggesting that Brown's actions were motivated by racial animus.

"To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'" *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004) (quoting *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (per curiam)). This discriminatory intent may be proved through either direct or circumstantial evidence. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). "Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption." *Id.* It "includes any statement or document which shows on its face that an improper criterion served as a basis–not necessarily the sole basis, but a basis–for the adverse employment action."[7] *Fabela v. Socorro Ind. Sch.*

---

[7] Neither the district court nor the parties address whether the actions taken against the Cardiologists constitute "adverse employment action[s]." Brown did not argue at the summary judgment stage that any of his alleged acts were not adverse employment actions.

16

No. 10-41332

*Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 328 (5th Cir. 2010).[8]

The district court is correct that direct evidence of discrimination can negate the need for proving discriminatory purpose with the *McDonnell Douglas* test. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047-48 (5th Cir. 1996) ("Generally, a plaintiff proves a prima facie case through a four-element test that allows an inference of discrimination. But a prima facie case can also be proven by direct evidence of discriminatory motive." (citations omitted)); *see also Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir. 1980). However, none of the evidence of racial discrimination cited by the district court meets the aforementioned definitions of "direct evidence." While Brown's memo may be "clearly derogatory," as the district court stated, it does not prove "without inference or presumption" that any of his actions were motivated by discrimination, *Jones*, 427 F.3d at 992, nor does it "sho[w] on its face that an improper criterion served as a basis . . . for the adverse employment action," *Fabela*, 329 F.3d at 415. The memo makes no reference to any actions taken or decisions made by Brown. Instead, it generally refers to the consequences of the Cardiologists seeking leadership roles at the hospital. Similarly, Brown's mention of his "Indian troubles" in an email is not made in the context of

Because he failed to make that argument before the district court, it is waived on appeal. *Morgan v. Swanson*, 659 F.3d 359, 405 (5th Cir. 2011) (en banc) ("Our well-established rule is that arguments not raised before the district court are waived and will not be considered on appeal." (internal quotation marks and citation omitted)).

[8] While *Fabela* involved claims brought under Title VII, in cases of alleged employment discrimination, "Section 1983 and [T]itle VII are parallel causes of action," *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 166 (5th Cir. 2007); *see also Irby v. Sullivan*, 737 F.2d 1418, 1431 (5th Cir. 1984).

17

No. 10-41332

discussing employment matters. Consequently, while Brown's statements may serve as circumstantial evidence that his actions were motivated by racial animus, they do not constitute direct evidence of discrimination. The other evidence cited by the district court, such as testimony from physicians regarding racial tensions at the hospital and Brown's bias against those of Indian origin, and other CMC employees' use of the term "the Indians," also constitutes only circumstantial evidence of discrimination.

Because the Cardiologists have not presented direct evidence of discrimination, the court must analyze their claims utilizing the *McDonnell Douglas* burden-shifting framework. That framework requires that the plaintiffs establish that they (1) belong to a protected class, (2) were qualified for the positions from which they were excluded, (3) were subject to an adverse employment action, and (4) were treated less favorably than similarly situated employees. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004). If the plaintiffs make out a prima facie case, it raises the presumption of discrimination, and the burden shifts to the employer to "articulat[e] a legitimate, nondiscriminatory reason for its actions." *Meinecke v. H&R Block of Hous.*, 66 F.3d 77, 83 (5th Cir. 1995) (per curiam). If the employer does so, then "the presumption disappears, and the plaintiff[s] must prove that the proffered reasons are a pretext for discrimination." *Id.*

In its order, the district court did not designate the individual actions by Brown that the Cardiologists claim violated their rights, nor did it specifically connect the evidence of discriminatory purpose to each action. Instead, the district court's decision concentrated on the Resolution, and only briefly mentioned the other claimed infringements of the Cardiologists' rights.

No. 10-41332

Therefore, we are not able to analyze the district court's legal conclusion that each of Brown's actions constituted an equal protection violation. "If the district court's factual findings are insufficient to allow this Court to review the judgment below, then we must vacate the judgment and remand for more detailed findings." *Colonial Penn Ins. v. Mkt. Planners Ins. Agency Inc.*, 157 F.3d 1032, 1037 (5th Cir.1998) (citation omitted). Accordingly, we must remand these claims in order for the district court to analyze the Cardiologists' equal protection claims against Brown outside of the Resolution. The district court should utilize the *McDonnell Douglas* burden-shifting framework, based on our finding that the Cardiologists have failed to provide direct evidence that Brown's actions were motivated by racial animus.

### C. Supplemental Jurisdiction over State Law Claims

In their second amended complaint, the Cardiologists asserted a claim for civil conspiracy against Dr. Campbell and the other defendants, as well as claims for tortious interference with contractual relations, tortious interference with prospective relations, and defamation against Dr. Campbell. The district court dismissed the civil conspiracy claim, and the Cardiologists have not appealed that dismissal. Dr. Campbell now argues that this Court lacks supplemental federal jurisdiction over the state-law claims asserted against him because they did not arise out of the same case or controversy as the federal claims asserted against the other defendants.

Dr. Campbell did not make this argument before the district court. He states that the district court properly exercised jurisdiction over him when the civil conspiracy claim was pending, and that "the conspiracy claim . . . was not dismissed until December 22, 2010, and the case was stayed shortly thereafter,"

19

No. 10-41332

such that he did not have the opportunity to raise this jurisdictional challenge before the district court.  Further, he argues that "this court may consider jurisdictional matters for the first time on appeal."  The Plaintiffs-Appellees respond that "[t]here is no right to an interlocutory appeal based on a district court's exercise of supplemental jurisdiction."

Because the district court was not given the opportunity to consider Dr. Campbell's challenge to its jurisdiction in the first instance, we also remand this matter.

## IV.  CONCLUSION

For the foregoing reasons, in regards to the Plaintiffs-Appellees' due process claims, we conclude that the Resolution was a legislative act subject to rational-basis scrutiny, which it survives.  We therefore REVERSE the district court's denial of summary judgment on the Plaintiffs-Appellees' due process claims, and REMAND with orders to dismiss those claims.  We find that the Plaintiffs-Appellees have stated a valid equal protection claim regarding the Resolution against Board members Donald Day, Joe Bland, Andrew Clemmons, M.D., Jennifer Hartman, and Luis Guerra, and that they are not entitled to qualified immunity.  We thus AFFIRM the district court's denial of summary judgment on that claim.  We further VACATE the district court's denial of summary judgment on the Plaintiffs-Appellees' equal protection claims against Brown for actions other than passage of the Resolution, and we REMAND those claims for individual analysis using the *McDonnell Douglas* burden-shifting framework.  Finally, we REMAND the state-law claims asserted against Defendant-Appellant Dr. William Campbell in order for the district court to determine whether subject matter jurisdiction exists over those claims.